IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | | |
|---|---|---|
| Martha Ann Wyatt Brown, | ) | |
| | ) | Civil Action No. 7:08-817-HFF-WMC |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Thelinh Tom Nguyen, MD, and | ) | |
| Mary Black Health Systems, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on the defendants' motion for summary judgment (doc. 46). The plaintiff originally filed this lawsuit on May 31, 2007, in state court against Dr. Thelinh Tom Nguyen, asserting the following claims: (a) civil conspiracy; (b) intentional interference with contract; (c) defamation *per se*; and (d) outrage. The plaintiff filed an amended complaint on January 10, 2008, to add Mary Black Health Systems, LLC ("Mary Black"), her former employer, as a defendant. The plaintiff asserted the following claims against Mary Black: (a) gender discrimination under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (b) harassment under Title VII; (c) retaliation under Title VII; (d) breach of contract related to Mary Black's anti-discrimination policies; and (e) breach of covenant of good faith and fair dealing. The case was removed to this court on March 6, 2008.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The plaintiff was hired by Mary Black to work in its Spartanburg, South Carolina, hospital's Intensive Care Unit ("ICU") on or about May 21, 2001. At that time, the plaintiff was a registered nurse with 14 years experience, having been licensed in South Carolina in 1987. The plaintiff had never had any complaint against her nursing license, nor had she ever suffered any significant form of disciplinary action in any prior nursing employment. The plaintiff worked as an ICU nurse for Mary Black without incident for five years, until May 2006. During that time, she received good performance evaluations, including her last evaluation on May 12, 2006. Moreover, her supervisors considered her to be a very good and experienced nurse.

Dr. Nguyen became a physician employee of Mary Black by contract dated March 18, 2003. Dr. Nguyen was hired as a vascular surgeon to run, along with his practice partners, what Mary Black termed its "Vascular Center." This was Dr. Nguyen's first full-time clinical position after completion of his training. Dr. Nguyen began his surgical practice at Mary Black on July 1, 2003. His contract term was for four years, terminating June 30, 2007. Mary Black subsequently dissolved the vascular unit in which Dr. Nguyen practiced and brought in the Vascular Surgery Center from Greenville Hospital System (Dove dep. 47-48; Nguyen dep. 17-18). At the end of its term, Dr. Nguyen's initial contract was not renewed. He is currently a vascular surgeon in Reno, Nevada (Nguyen dep. 9).

During the overnight shift on February 9-10, 2006, the plaintiff was assigned to care for one of Dr. Nguyen's post-surgical patients (Mr. "J") in Room 109 of the Mary Black ICU. Dr. Nguyen had left orders to be immediately notified if there was any change in status with regard to the patient's heart rate, blood pressure, or neurological changes (pl. resp. m.s.j., ex. 12 at 0040). During the night, the plaintiff called Dr. Nguyen at 7:40 p.m., 9:30 p.m., and 10:30 p.m. because of such changes in condition. On each of those occasions, Dr. Nguyen rudely dismissed her report, saying, "Don't call me anymore!" As

2

the plaintiff later reported, Dr. Nguyen told her on each occasion that she called that she "didn't need to call him," and he refused to come see about the patient. The plaintiff noted that at 2:15 a.m., Dr. Nguyen told her once again not to call him, and she informed Dr. Nguyen that she would chart that he did not want to be called about the patient. Further, in one of these telephone calls, Dr. Nguyen stated, "Women don't talk to me like that," and abruptly hung up on the plaintiff (pl. dep. 155-56).

The plaintiff claims that she reported all of these facts to her nursing supervisor, Ms. Edwina Otto. The plaintiff filed a Confidential Hospital Occurrence Report about the incident dated February 10, 2006. The plaintiff testified that she fully completed the incident report and independently decided what to include in the report and what to exclude. She then took the report to her supervisor, Ms. Otto, and she told Ms. Otto that she did not include the entire conversation. Ms. Otto agreed with the plaintiff's decision to leave the "women don't talk to me like that" comment out of the report, stating "This will do. You got your point across." The plaintiff did not voice any objection or concern with Ms. Otto's response (pl. dep. 154-55). The report does not contain any reference to the remark "women don't talk to me like that" or any other reference to gender (pl. resp. m.s.j., ex. 12).

Two other ICU nurses also filed a Confidential Hospital Occurrence Report about Dr. Nguyen on February 19, 2006, for inappropriate behavior in front of a patient (pl. resp. m.s.j., ex. 11). That incident involved Dr. Nguyen allegedly confronting another male doctor in a rude and condescending manner in front of a patient. Both of these reports were forwarded to the Mary Black administration for processing consistent with its employment policies and medical staff by-laws. On February 19, the same day as the second report, an e-mail from Sandi Ceremuga to Edwina Otto (ICU Nurse Manager), Phillip Wright (Hospital Administrator), Vickie Dove (Chief Nursing Officer), Chanda Flynn (Assistant Chief Nursing Officer), and Beth Long (Director of Risk Management) notified them of Dr. Nguyen's behavior in connection with the second report (pl. resp. m.s.j., ex. 43).

The next day this e-mail was forwarded by Ms. Dove to Dr. Gaines Hammond, a member of the Medical Staff Executive Committee, along with Mr. Glenn Robinson (Hospital CEO) and Nancy White (Mary Black Director of Quality Outcomes). The incident reports were also forwarded to Mr. Robinson and Mr. Wright (pl. resp. m.s.j., ex. 44). In the body of her e-mail, Ms. Dove recounted that she had attempted to discuss the matter with Dr. Nguyen and that he was aware of the nurses who had complained about him. Dr. Nguyen's responded that the nurses were "incompetent" and bothered him about needless things. Dr. Nguyen stated to Ms. Dove that, as to these nurses, he "will not kiss their butt." Ms. Dove noted further that this was the first complaint she had ever received on these nurses regarding their competency, and she further noted that in this conversation Dr. Nguyen "did not seem very receptive to me and my suggestions." Ms. Dove concluded that she is "concerned that we will continue to have issues regarding his patients if not addressed."

Thereafter, Dr. Nguyen received a letter formally notifying him of these written complaints and, in response, Dr. Nguyen requested a meeting with the Medical Staff Performance Improvement Patient Safety Committee ("MSPIPS") as detailed in an e-mail from Nancy White to Mr. Wright, Ms. Dove, Dr. George Haddad, and copying Dr. Joseph Boscia (pl. resp. m.s.j., ex. 45). According to Dr. Nguyen, the committee investigated the accusations, "and the whole thing was dropped" (Nguyen dep. 57-58). Dr. Nguyen was told by Dr. Boscia that he should write a letter of response to be placed in the file (Nguyen dep. 58), which he did in a letter dated May 25, [2006] (pl. resp. m.s.j., ex. 46). In that letter to Dr. Boscia, Dr. Nguyen characterized the complaints as "RIDICULOUS" and went on to state, "I SHOULD BE THE ONE writing these people up and not the other way around" (pl. resp. m.s.j., ex. 46).

Patient RH was admitted to Mary Black on May 13, 2006, with severely compromised vascularization in her lower left leg (Nguyen dep. 65-71). Dr. Jeff Rubin, Dr. Nguyen's partner, was the admitting physician and performed surgery on RH's leg, but was

unable to restore any viable circulation. Thereafter, Dr. Nguyen performed a second surgery and achieved minimally viable circulation in the left lower leg and foot, although there was still evidence of ischemia[1] in the left great toe. Over the next few days, RH's condition waxed and waned but generally showed some level of improvement. RH was moved to a floor unit to continue her recovery on May 18, 2006 (Hill dep. 39).

On Sunday, May 21, 2006, RH suffered an aspiration event while trying to eat, which resulted in a compromise of her respiratory system to the extent that she had to be intubated and transferred to the ICU. As a result of decreased oxygenation following the aspiration, RH was cyanotic[2] from head to toe (pl. resp. m.s.j., ex. 5). At approximately 3:00 in the afternoon, Dr. Nguyen was present in the unit and issued orders to the day shift nurse, Mary Hill. His orders were that RH was to be observed closely and that Dr. Doug Clark was to be contacted for ventilator management and critical care issues. Dr. Nguyen noted in RH's chart: "Pt is cyanotic from head to toes, but improving. Palpable graft pulses. Bear huggers and improved. Oxygenation should resolve vasospasm. Observe closely" (pl. resp. m.s.j., ex. 5 at 468). At approximately 4:30 p.m., Dr. Clark was in the unit and assessed the patient as per the notes of Ms. Hill, and he gave orders at that time.

When the plaintiff arrived shortly before 7:00 p.m. to take over on the overnight shift, Ms. Hill reviewed RH's condition with the plaintiff. According to the plaintiff, Ms. Hill told her that Dr. Nguyen instructed that he was not to be called overnight as he had discussed the case with Dr. Clark and turned over RH's critical care to him (pl. dep. 45-46). However, Dr. Nguyen testified:

> I told Mary Hill to observe my patient closely. Dr. Clark was going to manage the vent and the critical care issue. I told Mary Hill if there was no improvement in my patient's leg, I want to be notified immediately. When I left, her leg was improving.

---

[1]Ischemia is a local deficiency of blood supply produced by vasoconstriction or local obstacles to the arterial flow.

[2]Cyanotic means blueness of the skin, as from imperfectly oxygenated blood.

(Nguyen dep. 77). Further, Ms. Hill testified that she did not tell the plaintiff to call Dr. Nguyen if there were any changes in RH's condition, but she "just assumed she knew that" (Hill dep. 86). According to Ms. Hill, Dr. Nguyen required nurses to call him whenever there was a change, for good or bad, in the patient's condition (Hill. dep. 68-69). She testified that she did not call Dr. Nguyen during her shift because she did not believe there had been any change in RH's condition or that enough time had passed since Dr. Nguyen had observed RH to warrant calling him at that time (Hill dep. 68).

During the plaintiff's shift, when RH's respiratory condition deteriorated at one point causing changes in her vital signs as well as agitation as she began to fight against the ventilator. Dr. Clark was informed of this change (pl. resp. m.s.j., ex. 5; pl. dep. 19). According to the plaintiff, Dr. Clark verbally ordered that labs be drawn and this was done and documented by her (pl. resp. m.s.j., ex. 5 at 471). Dr. Clark later returned to assess the patient and adjust her medication to more deeply sedate her and keep her from fighting the ventilator. During the periods of agitation, RH experienced lower profusion of oxygen through her body, and this occurred on and off throughout the plaintiff's shift (pl. dep. 52, 73). The last communication the plaintiff had with Dr. Clark that night was at 10:30 p.m. (pl. dep. 52).

The following deteriorations in RH's condition occurred during the plaintiff's shift:

> (1)    RH's left great toe changed from cyanotic (blue) at 7:20 p.m. on May 21,2006, to necrotic (black) at 2:00 a.m. on May 22, 2006;
>
> (2)    RH's entire left leg changed from slightly cyanotic at 7:20 p.m. on May 21, 2006, to dark purple at 3:00 a.m. on May 22, 2006;
>
> (3)    RH's responsiveness changed from moving to sound at 7:20 p.m. on May 21, 2006, to moving only to deep stimuli at 3:00 a.m. on May 22, 2006; and

(4)     RH's pulse changed from being heard with the Doppler
at 7:20 p.m. on May 21, 2006, to having no pulses at 3:00 a.m.
on May 22, 2006.

(Pl. resp. m.s.j., ex. 5 at 461-62; pl. dep. 51-60, 72, 77, 85).

Despite not calling Dr. Nguyen or any other physician, the plaintiff noted, "Dr. Aware" of patient's condition at 3:00 a.m. on May 22, 2006, immediately following her notations regarding the deteriorations in RH's condition (pl. resp. m.s.j., ex. 5 at 462). The plaintiff admits that no physician was made aware of the changes that occurred in RH's condition at 2:00 a.m. and 3:00 a.m. on May 22, 2006 (pl. dep. 51-60, 72, 77, 85).

Ms. Hill arrived the next morning to begin the day shift shortly before 7:00 a.m., and the plaintiff gave her a verbal report of the events of the night and also provided the chart for review. Ms. Hill was shocked to see the deterioration in the condition of RH's leg (Hill dep. 99). Ms. Hill specifically recalls observing RH's leg:

> When I got there that morning, that morning when I lifted back
> the covers the leg was black. There didn't appear to be any
> signs of circulation in that leg. There was no pulse and the leg
> was black . I was shocked ... the whole leg from the knee down
> was black. You don't forget what that looks like.

(Hill dep. 99, 101). According to Ms. Hill, while she was examining RH, she was called out of the room to assist another patient (Hill dep. 52-53). Ms. Hill took no action with regard to RH prior to Dr. Nguyen's arrival sometime around 8:00 a.m. Mary Black employees allege that upon his arrival on the morning of May 22, 2006, Dr. Nguyen was very upset with the condition of RH's left leg and foot (Godfrey dep. 40). He asked Ms. Hill why he had not been contacted when the patient's condition changed (Hill dep. 61, 66, 85). Dr. Nguyen also asked Ms. Hill which nurse cared for RH the night before, and Ms. Hill told him that it was the plaintiff (Hill dep. 89). The substance of Dr. Nguyen's concern was that he had not been called by Ms. Hill or the plaintiff regarding the change of condition in RH's leg overnight (Hill dep. 61-63, 85). According to Dr. Nguyen, RH's leg was dead when he returned to the hospital on the morning of May 22nd (Nguyen dep. 78, 83-84). Dr. Nguyen's

7

notes to RH's chart at 8:00 a.m. on May 22, 2006, state, "Cadaveric left leg - plan for amputation knee" (pl. resp. m.s.j., ex. 5 at 469). Dr. Nguyen testified that had the plaintiff called him when RH's condition first changed during her shift, he is confident that he could have taken RH back to the operating room and restored blood flow to her leg (Nguyen dep. 80). Dr. Nguyen stated that he would have made a cut on the graft and removed the blood clot in the arterial artery, allowing him to keep the graft open and maintain blood flow. According to Dr. Nguyen, this would have been a simple procedure (Nguyen dep. 80-81). However, because the left leg was cadaveric when Dr. Nguyen first observed RH on May 22, 2006, the only option was to amputate her leg, which he did on May 23, 2006.[3]

From May 22 through June 2, the plaintiff and Ms. Hill continued to be scheduled to work in the ICU, in general, and to provide care to RH, in particular (Hill dep. 61).

On May 22, 2006, after Dr. Nguyen initially observed RH and became upset that he had not been contacted about the changes in RH's condition, Ms. Hill contacted her supervisor, Denise Godfrey (the ICU Manager) (Hill dep. 66; Godfrey dep. 28-29, 33). Ms. Godfrey observed RH's leg (Godfrey dep. 28-29; Hill dep. 101-102). Ms. Godfrey subsequently reviewed the nursing notes from May 21, 2006 (Godfrey dep. 30). She then met with Chanda Flynn, the Assistant Director of Nursing, and they determined that there needed to be further investigation into the nursing care provided to RH (Flynn dep. 16-20; Godfrey dep. 39; Flynn decl. ¶ 2). Ms. Flynn began taking steps to schedule a Root Cause Analysis ("RCA") meeting. The purpose of an RCA meeting is to investigate issues that may have been detrimental to patient care (Flynn dep. 25; Flynn decl. ¶ 2).

On May 24, 2006, Dr. Nguyen wrote a formal letter of complaint to Ms. Dove alleging that the plaintiff and Ms. Hill had failed to follow orders with regard to the care of

---

[3]Dr. Nguyen could not amputate RH's leg until her condition stabilized and her International Normalized Ratio became normal, which did not occur until the following day (Flynn decl., ex. A; Hill dep. 67).

RH, during the evening of May 21, 2006, and early morning hours of May 22, 2006. Dr. Nguyen stated in this letter:

> When I reviewed the nursing record, Ann Brown repeatedly wrote in her nursing assessment note that "Dr. Aware" of patient's leg condition. This was a blatant lie! I never received a single page from Ann Brown. This is a major medical-legal issue.
>
> [RH] had to undergo a left above-knee amputation. She lost her leg because of poor nursing care! There is no excuse for this.
>
> I would be grateful if you would look into this issue.

(Pl. resp. m.s.j., ex. 47).

Mary Black attempted to schedule the RCA meeting on May 25, 26, 30, and 31. However, the plaintiff indicated that she was not able to attend on these dates. The plaintiff subsequently asked to schedule the meeting after her shift on June 2, 2006 (Flynn dep. 87-88; dep. ex. 15). The following seven individuals attended the RCA meeting on June 2, 2006: Chanda Flynn (Assistant Director of Nursing); Beth Long (Risk Manager); Nancy White (Chief Quality Officer); Denise Godfrey (Nurse Manager ICU); Joan Ragan (Director of Nursing for Women's and Children's Services); Mary Hill; and the plaintiff (Flynn dep. 27; dep. ex. 2). Ms. Flynn took notes during the RCA meeting (Flynn dep. 37; dep. ex. 4; Flynn decl. ¶ 6).

During the RCA meeting, the participants reviewed and discussed the nursing care provided to RH on May 21 and 22, 2006 (Flynn dep. 39; dep. ex. 5). When questioned about the significant deteriorations in RH's condition and why she did not contact Dr. Nguyen, the plaintiff responded that she thought Dr. Nguyen was already aware of the condition of RH's leg and claimed that RH's left toe was necrotic to begin with. The plaintiff also alleged that she thought RH's leg was going to be amputated anyway (dep. ex. 3).

According to Mary Black, the RCA also revealed that the plaintiff wrote orders for laboratory tests without receiving verbal orders from a physician (Flynn dep. 47-56).

9

During the plaintiff's shift on the night of May 21, Dr. Clark was the pulmonologist responsible for RH's critical care and ventilator management. Dr. Clark's responsibility for critical care was primarily focused on pulmonary management (Clark dep. 25). During the RCA meeting, the plaintiff admitted that she wrote orders that night without obtaining a verbal order from Dr. Clark (Godfrey dep. 79; Flynn dep. 56; dep. exs. 2, 3, 4). The plaintiff said that she thought the orders she wrote were authorized by "ICU Standing Orders." The plaintiff was informed that there were no such standing orders (Godfrey dep. 74; dep. ex. 3). The plaintiff claims that Ms. Long and Ms. Flynn "verbally attacked" her from the outset of the meeting (Brown dep. 16-18).

The plaintiff later alleged that Dr. Clark came by RH's room and gave her verbal orders for the laboratory tests (dep. ex. 2). Ms. Flynn spoke with Dr. Clark about this after the RCA meeting. Ms. Flynn recalls that Dr. Clark said he did not specifically recall giving the orders and that he would not have given the orders to test magnesium and calcium (Flynn dep. 47-50; dep. ex. 4). Dr. Clark asked Ms. Flynn to write a letter for him to sign regarding the incident (Flynn dep. 57-59). Ms. Flynn drafted the letter and took it to Dr. Clark, but he later refused to sign the letter (Flynn dep. 57-59; dep. ex. 7). Dr. Clark admits that he does not specifically recall giving the verbal order to the plaintiff and is not 100% sure he gave the order (Clark dep. 13, 15, 41). Dr. Clark cannot recall the conversation he had with Ms. Flynn (Clark dep. 13, 15). Dr. Clark does recall having a conversation with a female about the proposed letter (Clark dep. 21). Dr. Clark recalls that his partner, Dr. Smith, contacted him on June 5, 2006, and asked him to go back and sign the verbal order for the laboratory tests, which he did (Clark dep. 15, 44; Flynn dep. 58). Dr. Clark admits that he would not normally order tests for magnesium and calcium (Clark dep. 17, 37). Dr. Clark admits that RH's records show that the laboratory tests were ordered at 8:30 p.m. and that he was not present in the unit until 10:30 p.m. (Clark dep. 27). Dr. Clark admits that the only reason he currently believes he gave the verbal order is that

it would have been reasonable for him to do so (Clark dep. 42). On September 20, 2006, Dr. Clark provided a letter to the South Carolina Department of Labor, Licensing, and Regulation stating:

> While I do not claim to remember the specifics of every verbal order I give, I have reviewed the records and it is likely that I did give the verbal order for a CBC, BMP, magnesium and calcium to the nurse in question on 05-21-06 at 2030.
>
> Additionally, I was present in the ICU at Mary Black, as documented in nursing notes, at 1610 and again at 2230 on 05-21-06.

(Pl. resp. m.s.j., ex. 27).

During the RCA meeting, Ms. Hill admitted that her charting was not sufficient to protect herself and Mary Black (Hill dep. 83, 92). Ms. Hill admitted the following: (1) she did not chart every hour that she checked RH's pulse; (2) she did not put the date beside some of her time entries; (3) she did not chart what RH's foot looked like every hour; (4) she did not chart changes in RH's condition on her assessment forms that she noted on her nursing notes; (5) she should have called Dr. Nguyen on May 21, 2006, at the end of her shift and informed him that there was no change in RH's condition; (6) she incorrectly wrote on the assessment form on May 22, 2006, that the leg was cyanotic, when in fact only the upper leg was cyanotic and the leg was black below the knee; and (7) she should have called Dr. Nguyen earlier on May 22, 2006, when she came in and observed that RH's leg was black (Hill dep. 68,71,76-78, 86-88). Ms. Hill was verbally counseled about her charting (Hill dep. 91-92). At the end of the RCA, Ms. Hill thanked everyone for their time and said that she was going to make changes in her behavior and documentation (Hill dep. 74). Ms. Hill was visibly upset with herself during the RCA meeting (Hill dep. 94).

According to Mary Black, the plaintiff did not admit to any deficiency in patient care during the RCA. She did not admit that she should have contacted Dr. Nguyen regarding the changes in RH's condition and was unwilling to accept any responsibility for

her actions (Flynn dep. 87; dep. ex. 15).  Ms. Flynn did not get the impression during the RCA that the plaintiff wanted to correct her behavior or that these same issues would not occur in the future (Flynn decl. ¶ 4).

During the RCA meeting, the plaintiff and Ms. Hill were given copies of Mary Black's Chain of Command policy, Charting by Patient Care Personnel policy, In-House Patient Transfer and Checklist policy (Godfrey dep. 52; dep. ex. 3 at 3).  The following issues were also discussed with the plaintiff and Ms. Hill:  (1) "reporting to oncoming shift with use of chart/orders"; (2) ICU has no standing orders; (3) "notification of MD when there is a change in patients condition, etc."; (4) "more thorough documentation"; and (5) "occurrence reports for anything out of the ordinary" (dep. ex. 3 at 3-4).  The plaintiff and Ms. Hill were also asked to read the South Carolina Nurse Practice Act.  Mary Black subsequently provided additional training and information to all staff regarding documentation, standing orders, shift reports, patient satisfaction scores, and the Nurse Practice Act (dep. ex. 3 at 3).  Following the RCA meeting, both Ms. Flynn and Ms. Godfrey typed reports regarding the meeting (dep. exs. 2, 3).

After Mary Black's investigation of the nursing care provided to RH, Ms. Flynn consulted Tim Hays, the Vice President of Human Resources, regarding the appropriate disciplinary action (Hays decl. ¶ 8; Flynn dep. 93, 112-13).  Ms. Flynn did not have the authority to terminate the plaintiff's employment, but Mr. Hays did (Flynn dep. 113).  Ms. Flynn informed Mr. Hays that during the RCA meeting, the plaintiff admitted that she did not contact the treating physician and that, throughout her nursing notes, the plaintiff documented that the physician was aware of the patient's changes in condition (Hays decl. ¶ 5).  Ms. Flynn informed Mr. Hays that during the RCA meeting, the plaintiff admitted she ordered laboratory tests without first obtaining a verbal order from a physician.  Ms. Flynn told Mr. Hays that during the RCA, the plaintiff stated that she understood that there were standing orders allowing her to order these laboratory tests without obtaining orders from

a physician (Hays decl. ¶ 6).  Ms. Flynn also informed Mr. Hays that during the RCA meeting, the plaintiff did not understand that she had done anything wrong and did not understand the seriousness of her conduct (Hays decl. ¶ 7).

Ms. Flynn and Mr. Hays discussed the appropriate level of discipline.  Ms. Flynn and Mr. Hays were aware that the plaintiff did not have prior disciplinary warnings. However, based on the seriousness of the violation and the resulting amputation of patient RH's leg, Mr. Hays determined that the appropriate action was to terminate the plaintiff's employment.  Specifically, the medical record revealed that patient RH's condition was stable when Ms. Hill ended her shift at 7:00 p.m. on May 21, 2006.  During the plaintiff's shift, there were significant changes in the patient's condition that required notification to the treating physician, Dr. Nguyen (Hays. decl. ¶ 8).

Ms. Flynn agreed with this decision (Flynn dep. 124-25.)  According to Ms. Flynn and Mr. Hays, this decision was based solely on the information obtained in the RCA meeting and the medical records of RH (Flynn decl. ¶ 7; Hays decl. ¶ 8).  Mr. Hays subsequently informed Ms. Dove and Mr. Wright of this decision.  Both Ms. Dove and Mr. Wright supported the termination decision (Hays decl. ¶ 8).

On June 6, 2006, Ms. Flynn and Mr. Hays met with the plaintiff to inform her of the decision to terminate her employment.  During this meeting, the plaintiff alleged that at the beginning of her shift on May 21, 2006, Ms. Hill told her that Dr. Nguyen did not want to be called (pl. dep. 119; dep. ex. 14).  The plaintiff claims that Ms. Hill's comment caused her not to call Dr. Nguyen about the changes in RH's condition (pl. dep. 85).  The plaintiff admits that she would have called Dr. Nguyen if Ms. Hill had not made this statement (pl. dep. 88-89).  The plaintiff wrote on her termination form that she had a witness to Ms. Hill's statement that Dr. Nguyen did not want to be called (pl. dep. 120; dep. ex. 14).  However, the plaintiff refused to disclose the name of this alleged witness during the termination

meeting (Flynn dep. 82-83). The plaintiff has failed to ever identify any such alleged witness, despite Mary Black's request (pl. dep. 120).

Following the plaintiff's termination meeting, Ms. Flynn questioned Ms. Hill about the plaintiff's allegation (Flynn dep. 64-65; Hays decl. ¶ 9). Ms. Hill denied making this statement to the plaintiff, and Ms. Flynn documented Ms. Hill's denial (dep. ex. 8).

During the termination meeting, the plaintiff also verbally suggested that her termination was influenced by a prior complaint she made against Dr. Nguyen (Hays decl. ¶ 10). Mr. Hays told the plaintiff that he was not aware of her complaint. Both Mr. Hays and Ms. Flynn later stated they were unaware that the plaintiff had made any complaint against Dr. Nguyen (Flynn dep. 66, 123-24; Hays decl. ¶ 10). Mr. Hays had never seen a copy of the plaintiff's complaint, and Ms. Flynn did not see a copy of the complaint until after the lawsuit was filed (Flynn dep. 66, 123-24; Hays decl. ¶ 10). Mr. Hays had been employed by Mary Black for only about two months at the time of the plaintiff's termination and was not aware of any complaints against Dr. Nguyen (Hays decl. ¶ 10). Neither Ms. Flynn nor Mr. Hays discussed RH or the plaintiff with Dr. Nguyen (Flynn decl. ¶ 9; Hays decl. ¶ 10).

In the Employee Comments section of the termination form, the plaintiff wrote that RH's condition was actually improving during her shift, and she maintained so during her deposition (pl. dep. 121; dep. ex.14). The plaintiff also wrote "no action taken against the other nurse [Ms. Hill]" (pl. dep. 122; dep. ex. 14).

In addition to the counseling received in the RCA, Ms. Hill received verbal counseling on July 14,2006. This warning stated:

> Occasional carelessness or failure to perform assigned duties in appropriate manner or at assigned times. Failure to reassess/document assessment after changes in patient condition. "No Doppler pulse in lower extremity" documented at 1510 - no further documentation regarding status of extremity for remainder of the shift."

(Dep. ex. 39). Ms. Hill agreed with this counseling (Hill dep. 90). According to Mary Black, Ms. Hill did not receive further discipline relating to the care of RH because Ms. Hill understood her mistakes, and the hospital was convinced she would correct her mistakes. Further, the significant deteriorations in RH's condition did not occur on Ms. Hill's shift, Ms. Hill did not falsely make any report in her documentation, and Ms. Hill did not practice outside her scope of authority (Flynn decl. ¶ 10; Dove dep. 73).

Following the plaintiff's termination, Ms. Flynn and Beth VanOrsdale (the Assistant Director of Human Resources at the time) determined that they were required by the Nurse Practice Act to report the plaintiff's patient care issues to the State Board of Nursing (dep. ex. 15; Flynn dep. 84, 88). The Nurse Practice Act requires an employer, including an agency or supervisor of nurses, to report instances of misconduct or incapacities. S.C. Code Ann. § 40-33-111. "A nurse supervisor who fails to timely report the misconduct or incapacity may be subject to disciplinary action and civil sanctions." *Id.*

Ms. Flynn consulted Ms. Dove regarding reporting the plaintiff's conduct to the Board of Nursing (Dove dep. 79; Flynn decl. ¶ 11). Ms. Dove sat on the Investigative Review Board at the Board of Nursing (Dove dep. 79). Ms. Dove agreed that the plaintiff's conduct should be reported to the Board of Nursing because the plaintiff wrote orders for laboratory tests without receiving an order from a physician, and because the plaintiff wrote in her nursing notes that the physician was aware of changes in the patient's condition even though the physician was not made aware (Dove dep. 79, 82-83, 93). According to Mary Black, Ms. Hill was not reported to the Board of Nursing because she did not falsify any documentation and did not engage in conduct outside of her scope of practice (Dove dep. 73, 82; Flynn decl. ¶ 10).

Following the filing of the defendants' motion for summary judgment, on October 4, 2009, the Board of Nursing approved a Consent Agreement In the Matter of

Martha A. Wyatt Brown, R.N., OGC # 08-0122 (def. addend. m.s.j., ex. 1).  In the Consent

Agreement, the plaintiff made the following admission:

> Respondent admits that on or about May 22, 2006, while employed at Mary Black Hospital in Spartanburg, SC, she failed to promptly notify the attending surgeon, Dr. T. Nguyen, when a patient's circulatory status changed in the left great toe. Respondent's Nurse Progress Notes on this patient state that the color in the left great toe changed from "cyanotic" at 1920 on 5121/06 to "necrotic" at 0200 on 5122/06. Respondent contends that she made a formal written complaint to her ICU Nursing Supervisor against the above-referenced surgeon on 2/16/06, regarding his unprofessional behavior when notified overnight of a change in a patient's condition.

(Def. addend. m.s.j., ex. 1 at 1, ¶ 2).  The plaintiff further admitted that "[o]n or about

June 6, 2006, [she] was terminated for failure to comply with [Mary Black's] policy and

procedure 8.13, regarding the violation of safety standards, or other standards, which

compromise the physical well being of patients" (def. addend. m.s.j., ex. 1 at 1, ¶ 4).  The

plaintiff also admitted that her conduct violated the South Carolina Nurse Practice Act, and

she consented to a public reprimand for her conduct in addition to other penalties and

additional education (def. addend. m.s.j., ex. 1 at 2, ¶ 1).


## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for

summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate

that: (1)there is no genuine issue as to any material fact; and (2) that he is entitled to

judgment as a matter of law.  As to the first of these determinations, a fact is deemed

"material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

## ANALYSIS

### Title VII Gender Discrimination

The plaintiff may establish a claim of gender discrimination in either of two ways: (1) by "'using any direct or indirect evidence relevant to and sufficiently probative'" of discriminatory purpose, or (2) by using the burden-shifting approach outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Rhoads v. FDIC*, 257 F.3d 373, 391-92 (4th Cir. 2001) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir.1999)).

To overcome summary judgment by proving direct evidence of discriminatory purpose, the plaintiff must point to "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995)). The only gender-based statement the plaintiff has alleged is that Dr. Nguyen said, "Women don't talk to me like that." The plaintiff admits she did not make this allegation in her Occurrence Report and only told her supervisor about the comment. There is absolutely no evidence that this alleged comment had any relationship to the plaintiff's termination, which occurred approximately four months later. In order for such remarks to be indicative of discrimination, they must not be isolated and must be "related to the employment decision in question." *Brinkley*, 180 F.3d at 608; *see also O'Connor v. Consol. Coin Caterers, Corp.*, 56 F.3d 542, 549-50 (4th Cir. 1995) (finding insufficient nexus between age-related statements and adverse employment action where plaintiff could not recall context of first

18

statement, another statement was made in connection with ability to play golf, and third statement was no more than innocuous commentary on fact that all people grow older); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (concluding that statement "there comes a time when we have to make way for younger people" reflected "no more than a fact of life" and was too remote to show age discrimination).

Neither the plaintiff's supervisor nor Dr. Nguyen was involved in the plaintiff's termination. The evidence of record is that the termination decision was made by Ms. Flynn and Mr. Hays, neither of whom was aware of either the alleged gender-based comment or the plaintiff's February 10 complaint. Therefore, as argued by the defendants, the plaintiff cannot proceed under the direct evidence proof standard.

To establish a *prima facie* case of gender discrimination under Title VII, the plaintiff must show: (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) other similarly-situated employees who are not members of the protected class did not suffer the same adverse action. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).

The plaintiff first alleges that Mary Black treated her differently than Dr. Nguyen with regard to the handling of the complaint made by her against Dr. Nguyen versus the handling of the complaint made by Dr. Nguyen against her. The plaintiff cannot establish a *prima facie* case with regard to this allegation. Dr. Nguyen is not a similarly-situated employee and alleged differential treatment of him cannot form the basis of the plaintiff s gender discrimination claim. "In disparate treatment cases, comparisons among employees are valid only if the employees are similarly situated." *Bryant v. Food Lion, Inc.*, 100 F. Supp. 2d 346, 371 (D. S.C. 2000). The courts have interpreted "similarly situated" to mean that a comparison is only proper when the individuals have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same

conduct without ... differentiating or mitigating circumstances." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted); *see also Harvey v. County of Koochiching*, 527 F.3d 711, 721 (8th Cir. 2008) ("To prove discrimination based on similarly-situated persons of another sex, however, 'the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'") (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)).

As a physician, any misconduct or disciplinary issue regarding Dr. Nguyen was submitted to MSPIPS. Furthermore, the conduct that led to the plaintiff's termination is not comparable to the alleged conduct of Dr. Nguyen. Dr. Nguyen's alleged conduct involved allegations of rudeness to and arguments with other employees, both male and female (dep. ex. 9, 11, and 12). The plaintiff's misconduct involved her failing to follow the Chain of Command and report significant deteriorations in RH's condition and then misrepresenting that she made such report to a physician when she did not.

The plaintiff also argues that she was treated differently than Mary Hill because Ms. Hill was not disciplined for similar conduct. However, as pointed out by the defendants, Ms. Hill is in the same protected class as the plaintiff and thus such does not support a claim of gender discrimination.

The plaintiff also alleges Mary Black discriminated against her by not following its equal employment opportunity policy with respect to her alleged complaint that Dr. Nguyen made a gender-based comment to her. The plaintiff testified that she fully completed the incident report and independently decided what to include in the report and what to exclude. She then took the report to her supervisor, Ms. Otto, and she told Ms. Otto that she did not include the entire conversation. Ms. Otto agreed with the plaintiff's decision to leave the "Women don't talk to me like that" comment out of the report, stating "This will do. You got your point across." The plaintiff did not voice any objection or

concern with Ms. Otto's response (pl. dep. 154-55).  As pointed out by the defendants, if the plaintiff was not comfortable with Ms. Otto's alleged agreement that the plaintiff did not need to add this allegation to the report, but the plaintiff wanted this issue investigated, she had a duty to pursue one of the many avenues Mary Black has made available under its harassment policy (pl. dep. 170; dep. ex. 23).  The plaintiff admittedly did not make any effort to do so (pl. dep. 170-73).

The undisputed evidence is that Ms. Otto did not report the alleged verbal portion of the plaintiff's complaint, and Ms. Dove, who investigated the complaint, was not made aware of this allegation.  Furthermore, Ms. Otto is in the same protected class as the plaintiff.  As argued by the defendants, it is illogical to believe that she acted in a discriminatory manner by failing to report the verbal portion of the plaintiff's complaint.  *See DeWitt v. Mecklenburg County*, 73 F. Supp. 2d 589, 598 (D. Md. 1999) (stating that where a number of the challenged employment decisions were made or implemented by a member of plaintiff's own gender, the plaintiff's unsupported, self-serving allegations are particularly unpersuasive).

Based upon the evidence before the court, the plaintiff and Ms. Otto were the only individuals aware of the alleged comment.  Therefore, it could not have been the basis for any decision related to discipline of Dr. Nguyen or the plaintiff, as Ms. Otto was not involved in either of these matters.

Based upon the foregoing, this claim fails.


### Title VII Retaliation

The plaintiff next alleges that her employment was terminated in retaliation for her filing the February 10, 2006, Confidential Hospital Occurrence Report against Dr. Nguyen.  The Fourth Circuit Court of Appeals has held that the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), also applies

in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Pursuant to the *McDonnell Douglas* burden-shifting analysis, to establish her retaliation claim, a plaintiff must first establish a *prima facie* case by showing that (1) she engaged in a protected activity, (2) the employer took adverse employment action against her, and (3) her protected activity was causally connected to some adverse employment action. *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If the employer can state legitimate, non-retaliatory reasons for the adverse employment action, the plaintiff must produce evidence establishing that the employer's stated reasons for the adverse action were mere pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000).

One method of establishing the "causation" element of the *prima facie* case is to demonstrate close temporal proximity between the alleged protected activity and the adverse action. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The general rule, however, is that it is not enough to recycle evidence of temporal proximity – a component of the *prima facie* case of retaliation – as proof of pretext as well. *Shoaf v. Kimberly-Clark Corp.*, 294 F. Supp.2d 746, 758 (M.D. N.C. 2003) ("Plaintiff cannot rely on temporal proximity alone to establish pretext."); *Yancey v. National Ctr. on Insts. & Alternatives*, 986 F. Supp. 945, 956 (D. Md. 1997) (granting summary judgment to employer where temporal proximity alone was offered as evidence of pretext).

Here, the plaintiff acknowledges that her reporting of the one alleged gender-related comment "might not meet the strict legal definition of 'opposition activity'" (pl. resp. m.s.j. 24). As noted by the defendants, the plaintiff's report did not include any facts or allegations suggesting that Dr. Nguyen's conduct was based on the plaintiff's gender or that the plaintiff believed that his comments were based on her gender (dep. ex. 12). The plaintiff's written complaint included only the allegation that Dr. Nguyen told her not to call

him all night and that he was rude (dep. ex 12). The complaint did not include the alleged gender-based comment that Dr. Nguyen said, "Women don't talk to me like that" (pl. dep. 156; dep. ex. 15). Accordingly, the February 10th report does not constitute protected activity.

Assuming for purposes of this motion that the plaintiff's verbal complaint to Ms. Otto regarding Dr. Nguyen's alleged comment is sufficient to constitute protected activity, the plaintiff cannot prove the third required element of the *prima facie* case. The plaintiff cannot show that Mary Black fired her because she engaged in a protected activity. The undisputed evidence shows that Ms. Flynn and Mr. Hays made the decision to terminate the plaintiff's employment. Neither of these individuals was aware of the plaintiff's written report, and neither was aware of Dr. Nguyen's alleged gender-based comment. Dr. Nguyen was not involved in the investigation into the plaintiff's conduct or the decision to terminate her employment (Flynn decl. ¶ 9). Neither Ms. Flynn nor Mr. Hays ever discussed this incident with Dr. Nguyen (Flynn dep. 119; Hays decl. ¶ 11; Flynn decl. ¶ 9). Accordingly, as the decision-makers were not aware of any protected activity by the plaintiff, she cannot show that Mary Black fired her because she engaged in a protected activity. "A plaintiff claiming retaliation must establish that the employer had knowledge of the protected activity in order for its subsequent adverse employment actions to be retaliatory." *Shield v. Federal Exp. Corp.*, 120 Fed. Appx. 956, 963 (4th Cir. 2005) (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004)).

Furthermore, assuming the plaintiff was able to establish a *prima facie* case of retaliation, the plaintiff has come forward with a legitimate nondiscriminatory reason for her termination: the plaintiff's failure to report significant deteriorations in RH's condition to Dr. Nguyen or any other physician and noting "Dr. Aware" following her documentation of the changes in RH's condition.

23

Accordingly, the plaintiff must show evidence of pretext in order to survive summary judgment. The plaintiff alleges that the less severe discipline of Ms. Hill is evidence of pretext. However, as argued by the defendants, RH's condition did not deteriorate during Ms. Hill's shift. Ms. Hill did not write in the nursing notes that a physician was aware of changes about which he admittedly was not made aware. Further, Ms. Hill recognized and admitted her mistakes and promised to improve. Importantly, the only evidence before this court is that neither Ms. Flynn nor Mr. Hays, undisputedly the only decision-makers with regard to the plaintiff's termination from employment, knew of the plaintiff's report against Dr. Nguyen when they terminated the plaintiff's employment (Flynn decl. ¶ 8; Hays decl. ¶ 10). In her response to the motion for summary judgment, the plaintiff states, "Although she initially denied it, Ms. Flynn was well aware of the history between [the plaintiff] and Dr. Nguyen" (pl. resp. m.s.j. 34). However, the plaintiff has cited no evidence in support of this statement. Again, the only evidence before this court is that neither Ms. Flynn nor Mr. Hays knew about the plaintiff's prior complaint regarding Dr. Nguyen at the time of her termination from employment.

Based upon the foregoing, the plaintiff's retaliation claim should be dismissed.

### Title VII Hostile Work Environment

To the extent the plaintiff has attempted to state a claim for sexual harassment,[4] such claim cannot survive summary judgment. To establish a claim of unlawful harassment based upon her gender, the plaintiff must establish the following four elements: (1) unwelcome conduct, (2) based on her gender, (3) sufficiently severe and pervasive to alter the terms and conditions of his employment, and (4) some basis to

---

[4]The plaintiff alleges in her complaint that Mary Black's actions "constituted illegal harassment, discrimination, and retaliation, all of which are prohibited by law pursuant to Title VII" (comp. ¶ 35). The defendant moved for summary judgment as to the harassment claim; however, the plaintiff did not address such a cause of action in her opposition to the motion.

impute liability to the defendant. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000). To survive summary judgment, the plaintiff must demonstrate that the "workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of employment and create an abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). The second element of a claim of racial harassment requires proof that the plaintiff would not have suffered the harassment "but for" her gender. *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007). With respect to the third element, Title VII does not protect employees from every instance of unpleasantness in the workplace. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). The Fourth Circuit has acknowledged that Title VII does not attempt to "'purge the workplace of vulgarity.'" *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)). In determining whether allegations of harassment are severe and pervasive to fit within Title VII's parameters, the court must examine the totality of the circumstances, including "'[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hopkins*, 77 F.3d at 753 (quoting *Harris*, 510 U.S. at 23).

The plaintiff cannot meet the third element of a *prima facie* case – that the harassment was severe and pervasive. Viewing the evidence in a light most favorable to the plaintiff, she alleges that when she called Dr. Nguyen about a patient on February 9, 2006, Dr. Nguyen made the comment, "Women don't talk to me like that" (pl. dep. 156). The plaintiff admits that this was the only gender-related statement Dr. Nguyen ever made to her (pl. dep. 157). Clearly this one comment is not sufficient to constitute harassment under Title VII. Accordingly, this claim fails.

***State Law Claims***

The remaining claims against Mary Black and Dr. Nguyen are all state law causes of action (civil conspiracy, intentional interference with contract, defamation *per se*, outrage, breach of contract, and breach of covenant of good faith and fair dealing). This case was removed to federal court based upon federal question jurisdiction as the plaintiff alleged violations of Title VII against Mary Black. 28 U.S.C § 1331; Notice of Removal at 2. The court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims as it is recommended that summary judgment be granted on the federal claims. *See* 28 U.S.C. § 1367(c); *see United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment (doc. 46) be granted as to the federal claims. It is further recommended that the court decline to exercise supplemental jurisdiction over the state law claims and that these claims be remanded to state court.

s/William M. Catoe
United States Magistrate Judge

February 12, 2010

Greenville, South Carolina